# United States Court of Appeals
## For the First Circuit

No. 17-2131

MARGARET LEE, on behalf of herself and all others similarly situated,

Plaintiff, Appellant,

v.

CONAGRA BRANDS, INC.,

Defendant, Appellee,

ROCHE BROS. INC.; ROCHE BROS. SUPERMARKETS, INC.; ROCHE BROS. SUPERMARKETS, LLC; STOP & SHOP SUPERMARKET COMPANY LLC,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Chief Judge,
Kayatta, Circuit Judge,
and Torresen,[*] U.S. District Judge.

Patrick J. Vallely, with whom Edward F. Haber and Shapiro Haber & Urmy LLP were on brief, for appellant.
Angela M. Spivey, with whom R. Trent Taylor and McGuire Woods LLP were on brief, for appellee.

---

[*] Of the District of Maine, sitting by designation.

May 7, 2020

**HOWARD**, **Chief Judge**. Margaret Lee purchased Wesson brand vegetable oil ("Wesson Oil") from grocery stores in Brookline and Mashpee, Massachusetts. The Wesson Oil label advertised that it was "100% Natural." After learning that Wesson Oil contained genetically modified organisms ("GMOs"), which Lee regarded as quite unnatural, she sued the manufacturer and distributer, Conagra Brands, Inc. ("Conagra"), in Massachusetts Superior Court. She sued on her own behalf and on behalf of others similarly situated. Lee alleged that, by labeling Wesson Oil "100% Natural," Conagra violated Massachusetts's prohibition against unfair or deceptive trade practices. See Mass. Gen. Laws ch. 93A ("Chapter 93A").[1] Conagra removed the action to federal court, and the district court dismissed Lee's complaint for failure to state a claim. The district court determined that Wesson Oil's label was neither unfair nor deceptive as a matter of law because it conformed to the Food and Drug Administration's ("FDA") labeling policy. We reverse.

## I.

We review de novo an order dismissing a complaint for failure to state a claim, and we reverse the dismissal if "the combined allegations, taken as true . . . state a plausible, not

---

[1] Lee originally named as co-defendants the supermarkets from which she bought Wesson Oil, but she later voluntarily dismissed them from the case.

- 3 -

a merely conceivable, case for relief." Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In undertaking this review, 'we accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor.'" Lanza v. Fin. Indus. Regulatory Auth., 953 F.3d 159, 162 (1st Cir. 2020) (quoting Nystedt v. Nigro, 700 F.3d 25, 30 (1st Cir. 2012)). To the extent that Lee's Chapter 93A complaint sounds in fraud, it must meet Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. See Shaulis v. Nordstrom, Inc., 865 F.3d 1, 13 n.6 (1st Cir. 2017). "The circumstances to be stated with particularity under Rule 9(b) generally consist of the who, what, where, and when of the allegedly misleading representation." Kaufman v. CVS Caremark Corp., 836 F.3d 88, 91 (1st Cir. 2016) (alteration and quotation marks omitted).

Although Conagra moved to dismiss the complaint on four grounds, the district court only addressed one; it agreed with Conagra that Wesson Oil's label was not unfair or deceptive as a matter of law because the label "conforms to FDA labeling policy." That policy essentially permits labeling a product as "natural" so long as it includes no added synthetic ingredients, like artificial colors or flavors. The district court also noted that the FDA

- 4 -

does not require the affirmative disclosure of GMOs' presence. Conagra raises three other arguments that the district court did not discuss. It submits: (1) that Lee fails to allege a cognizable Chapter 93A injury; (2) that the FDA affirmatively permits the "100% Natural" representation on Wesson Oil's label; and (3) that federal statutes -- namely, the Nutrition Labeling and Education Act, 21 U.S.C. § 343-1, and the National Bioengineered Food Disclosure Standard, 7 U.S.C. § 1639 et seq. -- preempt Lee's requested relief.

## II.

We begin, as ever, with subject matter jurisdiction. Conagra removed the case and justifies federal jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). CAFA requires minimal diversity and that at least $5,000,000 be in controversy. 28 U.S.C. § 1332(d)(2). Diversity is met because Lee is a resident of Massachusetts and Conagra is a Delaware corporation with its headquarters in Illinois. See id. § 1332(d)(2)(A). Conagra is the removing party, so it "bears the burden to show with a 'reasonable probability' that the amount in controversy requirement is satisfied." Cooper v. Charter Commc'ns Entm'ts I, LLC, 760 F.3d 103, 106 (1st Cir. 2014). Lee does not contest jurisdiction, and we are at ease finding federal jurisdiction proper based upon the allegations in Lee's amended

- 5 -

complaint and Conagra's unchallenged representations. See Liu v. Amerco, 677 F.3d 489, 493 (1st Cir. 2012).

Briefly, the complaint defines the class as "[a]ll persons who have purchased Wesson Oil products in Massachusetts that were labeled '100% Natural,'" and it is not limited to a specific period. The complaint seeks damages comprising "up to three times the damages that [Lee] and the Class incurred, or at the very least the statutory minimum award of $25 per purchase of a Wesson Oil product . . . together with all related court costs, attorneys' fees, and interest." In its Notice of Removal, Conagra noted that these Chapter 93A damages could potentially be trebled, and that, due to the large number of Wesson Oil purchases potentially at stake, the claims "yield an amount in controversy over and above the CAFA jurisdictional limit." Conagra has met its burden to show with a "reasonable probability" that $5 million is at stake. See id. ("It is not clear to a legal certainty that the amount in controversy is less than $5 million. So we proceed to the merits." (citation omitted)).

## III.

We turn to the district court's rationale for dismissing Lee's complaint. The district court analyzed whether Wesson Oil's label was "unfair" within the meaning of Chapter 93A, but it did not cite or discuss the standard for whether the label was "deceptive." Chapter 93A bars "unfair or deceptive acts or

- 6 -

practices." Mass. Gen. Laws ch. 93A, § 2(a) (emphasis added). The proscription is disjunctive, so the district court should have separately addressed whether the complaint alleged sufficiently that Wesson Oil's label was deceptive. See 35 Mass. Prac. Consumer Law § 4:16 (3d ed. 2017) (observing that an act or practice violates Chapter 93A if it is "either unfair or deceptive" (citing Commonwealth v. DeCotis, 316 N.E.2d 748 (Mass. 1974); Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc., 532 N.E.2d 660, 664 (Mass. 1989); Cherick Distribs., Inc. v. Polar Corp., 669 N.E.2d 218, 221 (Mass. App. Ct. 1996))). For the reasons that follow, we conclude that Lee's complaint plausibly alleges that Wesson Oil's label violated Chapter 93A's prohibition against deceptive acts or practices.[2]

When deciding whether conduct is deceptive under Chapter 93A, Massachusetts courts are "guided by interpretations of ["deceptive"] as found in the analogous Federal Trade Commission Act . . . 15 U.S.C. § 45(a)(1)." Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 487 (Mass. 2004); see also Mass. Gen. Laws ch. 93A, § 2(b). Those interpretations instruct that a food product label generally qualifies as deceptive in violation of Chapter 93A "when it has the capacity to mislead consumers, acting reasonably

---

[2] On appeal, Lee did not claim that the label was unfair, so she waived that argument. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

- 7 -

under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)." Aspinall, 813 N.E.2d at 487-88 (citing Matter of Cliffdale Assocs., Inc., 103 F.T.C. 110, 165 (1984)).

The complaint alleges that the "100% Natural" representation on the Wesson Oil label enticed Lee to buy the product because it indicated to her that the oil was GMO-free. "So, the question under Massachusetts law is whether the label had the capacity to mislead consumers, acting reasonably under the circumstances, to believe that [Wesson Oil] contained [no GMOs]." Dumont v. Reily Foods Co., 934 F.3d 35, 40 (1st Cir. 2019).

Pursuant to an agreement between the agencies, the FTC defers to the FDA's determinations as to whether food product labeling is deceptive. See Bristol-Myers Co. v. FTC, 738 F.2d 554, 559 (2d Cir. 1984) (citing 36 Fed. Reg. 18,539 (Sept. 16, 1971)). Accordingly, the FDA's guidance will inform our analysis as to whether these allegations survive dismissal. See Dumont, 934 F.3d at 41 ("[W]e see no unfair cost in recognizing a state-law claim that . . . can only be lodged against manufacturers that fail to adhere to the rules and safe harbors that have been created by the FDA and that help form consumers' expectations in reading labels.")

At this stage, our analysis begins and ends with the allegations in the complaint. Lee claims that Wesson Oil's label

could have misled a reasonable consumer into buying the product under the (false) impression that it contained no GMOs. The complaint asserts, for instance, that consumers consider whether products are "natural" when they make their purchasing decisions, and that they are willing to pay more for natural items. Lee further alleges that surveys show that many scientists and consumers do not consider GMO-containing products to be natural. She submits that Conagra indicated that Wesson Oil was "100% Natural" on its label even though it contained GMOs, that Lee herself understood "100% Natural" to mean that Wesson Oil was GMO-free, that she purchased it from specific grocery stores in Massachusetts "five or six times per year" for years, and that she bought a different product after she learned that Wesson Oil contained GMOs. The complaint thus plausibly alleges that Wesson Oil's label could have deceived a reasonable consumer.

Federal courts have permitted very similar complaints to go forward under other states' unfair or deceptive trade practices statutes. See, e.g., Garcia v. Kashi Co., 43 F. Supp. 3d 1359, 1384-86 (S.D. Fla. 2014) (collecting cases); Ault v. J.M. Smucker Co., No. 13 CIV. 3409 PAC, 2014 WL 1998235, at *6 (S.D.N.Y. May 15, 2014); In re Frito-Lay N. Am., Inc. All Nat. Litig., No. 12-MD-2413 RRM RLM, 2013 WL 4647512, at *15-16 (E.D.N.Y. Aug. 29, 2013). Conagra argues that Lee demands a disclosure as to whether Wesson Oil contains GMOs, and that the complaints in the above-

- 9 -

cited cases did not require any such disclosure. Conagra contends that a GMO disclosure obligation would contradict the FDA's views that: (1) GMO products may be advertised as natural; and (2) the unannounced presence of GMOs in a product never causes the product's label to mislead a reasonable consumer.

Conagra mischaracterizes Lee's complaint and the FDA's views. This complaint, precisely like those in the cases cited above, seeks damages resulting from Conagra's alleged misrepresentation. Lee does not request a specific, court-ordered label; in addition to damages, she seeks a limited injunction that would bar Wesson Oil's allegedly "false and deceptive marketing, branding, and labeling." If a court were to issue such an injunction, Conagra would not be required to disclose affirmatively whether Wesson Oil contains GMOs. Subject to the injunction's particulars, Conagra could almost certainly comply by excising the label's allegedly misleading claim that Wesson Oil is "100% Natural." See Garcia, 43 F. Supp. 3d at 1374 (explaining that the complaint did not seek an affirmative disclosure but instead "allege[d] that the 'all natural' representation . . . on the packaging would, and does, mislead reasonable consumers").

Moreover, granting Lee's requested relief would not contradict the FDA's guidance. The FDA has not said that GMOs are natural and may be advertised as such. Conagra does not cite any binding FDA guidance defining "natural," nor could it -- that

- 10 -

guidance does not exist. The FDA has merely noted its policy that a product may not be labeled as "natural" if it contains anything "artificial or synthetic (including all color additives regardless of source)." See Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definitions of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food, 58 Fed. Reg. 2,302, 2,407 (Jan. 6, 1993); see also Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms, 56 Fed. Reg. 60,421, 60,466 (Nov. 27, 1991) (noting that the "FDA has not attempted to restrict the use of the term 'natural'" and that its informal policy has been to interpret natural "to mean that nothing artificial or synthetic . . . is included in, or has been added to, the product that would not normally be expected to be there").

Conagra confuses the FDA's informal policy "not to restrict the use of the term 'natural'" with a rule defining it. See, e.g., 58 Fed. Reg. 2,407. Where, as here, an agency has issued no binding rule defining a term, the agency's pronouncements do not dictate whether a representation has the capacity to deceive a reasonable shopper under Chapter 93A. See Abruzzi Foods, Inc. v. Pasta & Cheese, Inc., 986 F.2d 605, 606 (1st Cir. 1993)(noting that, although the FDA issued a relevant rule, it declined to define "fresh" in the applicable context, so the plaintiff could not "appeal to the FDA rules for support"); see also Holk v.

- 11 -

Snapple Beverage Corp., 575 F.3d 329, 340-41 (3d Cir. 2009) (finding that the above-referenced FDA guidance does not amount to a formal definition of the term "natural").

Critically, the FDA's far more recent request for comment as to whether GMOs are natural implicitly acknowledges that the agency has not yet ruled that they are. See Use of the Term "Natural" in the Labeling of Human Food Products; Request for Information and Comments, 80 Fed. Reg. 69,905 (Nov. 12, 2015).[3] In other words, the FDA has not yet forged the regulatory "safe harbor" that Conagra imagines it inhabits here. See Dumont, 934 F.3d at 41. Because the FDA's statements to date concerning the use of the word "natural" are both nonbinding and nonexclusive, they would not foreclose a jury from finding that the use of "100% Natural" on Wesson Oil labels could deceive consumers into believing that the product was GMO-free.

As for Conagra's assertion that the FDA has blessed the wholesale nondisclosure of GMO ingredients in food products, the agency has not gone so far in this area. Conagra relies on the FDA's nonbinding statements, and it misreads those statements. See Abruzzi Foods, 986 F.2d at 606. We note that the FDA has

---

[3] Although the comment period closed nearly four years ago, the FDA still has not issued a binding definition. See Use of the Term "Natural" in the Labeling of Human Food Products, Regulations.Gov: https://www.regulations.gov/docket?D=FDA-2014-N-1207 (revealing no new docket activity since the comment period closing) (last accessed May 5, 2020).

observed that food labelers have no general freestanding duty to disclose on a product's label whether it contains GMOs. See Statement of Policy: Foods Derived from New Plant Varieties, 57 Fed. Reg. 22,984, 22,991 (May 29, 1992) (noting the FDA's position that the use of a GMO in a food product "would not usually be required to be disclosed in labeling for the food" (emphasis added)).

Conagra nonetheless asserts a much stronger proposition: that labelers never need to disclose whether their products contain GMOs, even when those labels might otherwise violate generally applicable consumer protection laws. That is a step too far. In support of its interpretation, Conagra relies only on draft FDA guidance stating that "the use, or absence of use, of bioengineering in the production of a food is not a fact that is material either with respect to consequences resulting from the use of the food or due to representations on the labeling." Draft Guidance for Industry: Voluntary Labeling Indicating Whether Foods Have or Have Not Been Developed Using Bioengineering; Availability, 66 Fed. Reg. 4,839, 4,840 (Jan. 18, 2001). Even if that guidance generally blesses silence regarding GMO ingredients, it falls far short of blessing an affirmative misrepresentation concerning the presence of such ingredidents.

Lee has alleged that Conagra's representation that the product was "100% Natural" suggested to her that Wesson Oil was

- 13 -

GMO-free, and that she was thereby deceived. In its reference to the draft guidance mentioned above, Conagra skips relevant context; the FDA also suggested that labels indicating GMOs' absence might be misleading:

> [T]he term "[GMO] free" may be difficult to use without being false or misleading. If it implies "zero," it may be very difficult to substantiate. The adventitious presence of bioengineered material may make a "zero" claim inaccurate. Further, these terms would be misleading if they imply that the food is superior because the food is not bioengineered.

Id. Lee contends that Conagra misled customers in an analogous way, with a similar -- albeit somewhat vaguer -- representation, and her complaint does not contradict any binding FDA rule blessing Conagra's label.

We close this section by noting that Conagra's reliance upon the National Bioengineered Food Disclosure Standard ("NBFDS") misses the mark. In 2016, Congress enacted the NBFDS, which charges the U.S. Department of Agriculture ("USDA") with crafting a method for disclosing "bioengineered" ingredients in food products. See 7 U.S.C. § 1639b(a). After this case was argued, the USDA published its Final Rule on the National Bioengineered Food Disclosure Standard ("Final Rule"), 83 Fed. Reg. 65,814 (Dec. 21, 2018). Conagra argues that the Final Rule supports dismissal because it provides that products like Wesson Oil may not need to disclose the fact that they contain GMOs. Indeed, the Final Rule

- 14 -

establishes that, where "[a refined] food does not contain detectable modified genetic material," bioengineered disclosure is not required. Id. at 65,816. And, "some oil refining processes may effectively eliminate all DNA" in the product, so "degummed refined vegetable oils and various other refined ingredients are unlikely to require [bioengineered] food disclosure . . . ." Id. at 65,834.

The Final Rule is nevertheless no help to Conagra at this stage. Even if we assume without deciding that the USDA sought to free Conagra of any obligation to disclose the presence of GMOs in Wesson Oil, it says nothing of representations suggesting GMOs' absence. See id. at 65,859 ("With respect to absence claims, NFBDS covers mandatory and voluntary bioengineered . . . claims and 7 U.S.C. [§] 1639b does not provide authority for [USDA] to establish an absence claims regime as part of the NFBDS. [USDA] notes that FDA . . . retain[s] authority over absence claims."). So, we return -- and not for the last time -- to this well-trampled ground: Lee's complaint does not demand any affirmative GMO labeling disclosure. The deceptive practice that she alleges is the labeling of Wesson Oil as "100% Natural," which she claims led her to believe that the oil was GMO-free.

We decline to wade into the debate over the best definition of "natural." At this stage, we need only decide whether Lee has plausibly alleged that a reasonable consumer might

- 15 -

think that "100% Natural" means that a product contains no GMOs, and then base her purchasing decision on that belief. See Dumont, 934 F.3d at 40. Lee has met that low threshold, so her claim may proceed.

**IV.**

We next dispose of Conagra's three alternative arguments in favor of dismissal.

First, Conagra insists that Wesson Oil's label cannot give rise to Chapter 93A liability because the FDA currently permits nondisclosure of GMOs on labels. See Mass. Gen. Laws ch. 93A, § 3 (exempting federally-blessed trade practices from Chapter 93A liability). That is not the issue before us. As we have already observed, the FDA has not approved the affirmative labeling of products containing GMOs as "100% Natural," so this alternative argument does not support dismissal.

Second, Conagra contends that federal law preempts Lee's claims. We have noted that "a Massachusetts law that imposed a labeling requirement beyond that imposed by federal law would be expressly preempted." Dumont, 934 F.3d at 41 (emphasis added). Conagra posits that two statutes -- the Nutrition Labeling and Education Act ("NLEA") and the NBFDS -- preempt the relief that Lee seeks.

The NLEA is an express preemption statute that bars state labeling requirements that are "not identical" to certain federal

- 16 -

labeling requirements. See 21 U.S.C. § 343-1(a). Neither in its brief nor when pressed at oral argument has Conagra pointed to any of those requirements as being implicated by Lee's claim. Any such argument is therefore waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

The NBFDS forbids states from directly or indirectly establishing "any requirement relating to the labeling of whether a food . . . is genetically engineered . . . or was developed or produced using genetic engineering." 7 U.S.C. § 1639i(b).[4] According to Conagra, Lee's claim under Chapter 93A establishes an indirect GMO disclosure obligation and is therefore explicitly preempted by this statute.

Conagra again mischaracterizes Lee's claim. Specifically, it argues that she "would require that Conagra disclose on the label that Wesson Oil was made from genetically modified or bioengineered plants to avoid being misleading." Not so. Lee contends that Conagra misled customers as to the contents of its vegetable oil. As discussed in Part III, the NBFDS does not encompass absence claims. See 83 Fed. Reg. at 65,859.

---

[4] We observe that Congress's later passage of the NBFDS may evidence its belief that the NLEA's preemption provisions did not govern bioengineered and genetically modified food products. See FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 143-44 (2000).

- 17 -

It is true that Lee points to no FDA regulation or guidance stating that a manufacturer may not describe as "100% Natural" a product that contains GMOs. But if "100% Natural" is reasonably read in light of the FDA's existing pronouncements to mean, among other things, "no GMOs," then the absence of an FDA pronouncement following Conagra's use of the term "100% Natural" should cut against Conagra, not immunize it. To conclude otherwise would be to say that food manufacturers can lie with impunity as long as the FDA has yet to bar the particular lie they wish to tell. The FDA likely does not have, for example, a rule specifically prohibiting labeling frog eggs "caviar."

Of course, that leaves open the question as to whether "100% Natural" is reasonably read to mean "no GMOs." But as we have already explained, the FDA has not offered a comprehensive definition of the term, nor has it said anything that would render inconsistent a finding that the term is so reasonably read. Cf. United States v. Piper, 35 F.3d 611, 617 (1st Cir. 1994) (holding that "there is no inconsistency" where an application note "neither excludes any [item] expressly enumerated in the [regulation], nor calls for the inclusion of any [item] that the [regulation] expressly excludes").

Third, Conagra asserts that Lee failed to allege a cognizable injury under Chapter 93A. To survive a motion to dismiss, a Chapter 93A complaint must allege that the "plaintiff

- 18 -

suffered an injury . . . by showing either an economic or a noneconomic injury." Bellermann v. Fitchburg Gas & Elec. Light Co., 54 N.E.3d 1106, 1110 (Mass. 2016). Where a plaintiff alleges deceptive conduct, she must allege more than "a 'per se' injury -- that is, a claim resting only on a deceptive practice, regulatory noncompliance, or the 'impairment of an abstract right without economic loss.'" Shaulis, 865 F.3d at 10 (quoting Rule v. Fort Dodge Animal Health, Inc., 607 F.3d 250, 253 (1st Cir. 2010)). To state a claim under Chapter 93A in a case such as this, a complaint must allege that "a defendant's unfair or deceptive conduct cause[d] customers to receive a product or service worth less than the one for which the customers paid." Bellermann v. Fitchburg Gas & Elec. Light Co., 18 N.E.3d 1050, 1060 n.10 (Mass. 2014).

Lee's complaint clearly alleges a Chapter 93A injury for pleading purposes. She claims that GMO-free vegetable oil is sold at a premium price as compared to oils containing GMOs. She cites several studies demonstrating that consumers are willing to pay more for food products containing no GMOs, and she alleges that Conagra's deceptive advertisement caused these consumers to pay that higher price for a product that did contain GMOs. This is a classic benefit-of-the-bargain injury, for which the measure of damages is "the monetary difference between the actual value of the product at the time of purchase and what its value would have

- 19 -

been if the representations had been true."  Aspinall, 813 N.E.2d at 490.  No more need be alleged at this stage of litigation.

## V.

For the foregoing reasons, we **reverse** the district court's dismissal of the complaint and **remand** for further proceedings consistent with this opinion.