# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARGARET LEE, On Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CONAGRA BRANDS, INC.<br><br>Defendant. | No. 1:17-cv-11042-NMG<br><br>**Leave to File Granted on March 11, 2021 (ECF 88)** |

## SECOND AMENDED COMPLAINT

Plaintiff Margaret Lee alleges for her complaint the following.

### Preliminary Statement

1.      Plaintiff brings this action on behalf of herself and all others similarly situated to obtain monetary and other appropriate relief for herself and members of the Class (defined below) as a result of the unlawful acts of defendant Conagra Brands, Inc. ("Defendant" or "Conagra").

2.      Conagra manufactures and distributes packaged food products, including Wesson brand cooking oils such as Wesson Vegetable Oil, Wesson Canola Oil, Wesson Corn Oil, and Wesson Best Blend ("Wesson Oil").

3.      Plaintiff purchased bottles of Wesson Oil that were manufactured by Conagra at stores in Massachusetts.

1

4. The label on the front of the bottles of Wesson Oil represented that it was "Pure & 100% Natural." Contrary to the representations in large print on the front of the bottle, however, the product contained unnatural ingredients and therefore was not "100% Natural."

5. Specifically, Wesson Oil is made from plants, the DNA of which has been deliberately altered by the forced introduction of DNA from other species. The plants therefore had specific traits, such as resistance to certain herbicides, which they do not possess in nature or through traditional cross-breeding methods. Plants and other life forms that are products of this process of unnatural DNA alteration are commonly referred to as genetically modified organisms, or "GMOs." Accordingly, contrary to Defendant's representations, Wesson Oil is not "100% Natural."

6. Defendant had thus been misrepresenting Wesson Oil and deceiving its customers, including Plaintiff and numerous other consumers. Defendant has injured Plaintiff and other consumers in Massachusetts by inducing them to purchase and consume unnatural products with GMOs on the false premise that such products are "100% Natural," and by selling such products at prices greater than what the products are actually worth, given that they are not, as represented, "100% Natural."

7. Defendant's conduct constitutes unfair and deceptive acts and practices in the conduct of trade and commerce and violates Massachusetts General Laws Chapter 93A. Accordingly, Plaintiff seeks, on behalf of herself and other Massachusetts consumers, to recover damages, including statutory and multiple damages, interest, attorneys' fees, costs, and any and all other relief permitted by law.

**Parties**

8. Plaintiff Margaret Lee is a resident of Brookline, Massachusetts.

9. Defendant Conagra is a Delaware corporation with its principal place of business in Chicago, Illinois.

## Jurisdiction

10. Defendant has removed this case from the Superior Court for Suffolk County, Commonwealth of Massachusetts on the basis that removal to this Court was proper under the Class Action Fairness Act of 2005. Without admitting or denying the factual predicates of Defendant's invocation of this Court's jurisdiction, which includes evidence solely in Defendant's possession, Plaintiff does not contest the Court's subject matter jurisdiction over this action, assuming Defendant's evidence and other representations presented in their notice of removal (Dkt. No. 1) are accurate and true.

## Factual Allegations

The Wesson Oils

11. Conagra is a packaged food company that manufactures and distributes products such as Wesson Oil throughout the United States, including through grocery stores in Massachusetts such as Roche Bros. and Stop & Shop stores.

12. At all relevant times, all bottles of Wesson Oil stated prominently in large print on the front of the label, as well as on the back of the label, that they were "Pure & 100% Natural." There was no qualification on bottles of Wesson Oil to the claim that Wesson Oil is "Pure & 100% Natural," and there was no indication on the bottles that Wesson Oil contains any GMOs. A picture of one of the bottles purchased by Plaintiff is on the following page.

3



13.    Conagra systematically labeled and marketed every bottle of Wesson Oil as "Pure & 100% Natural" in product packaging, print advertisements, in television commercials, and on the Wesson Oil website (www.wessonoil.com). That is, the "Pure & 100% Natural" labeling was part of a broad, pervasive marketing scheme that is directed to all consumers, without limitation as to geography or the location of the advertisement or sale of Wesson Oils.

14.    Imagery on the labels of bottles of Wesson Oil, such as a picture of the sun surrounding the word "Wesson," served to reinforce the message that Wesson Oil is purportedly "100% Natural."

The Importance to Consumers of "All Natural" Labels

15. Whether products such as Wesson Oil are in fact "100% Natural," and whether such products contain unnatural GMOs, is important to reasonable consumers.

16. In recent years, consumers have shown a significant and increasing interest in "all natural" products, spawning entire subindustries of "natural" products in a range of consumer goods, including food, health care, and personal care items. Consumers place a greater value on "natural" products based on perceptions that "natural" products are safer, healthier, or otherwise of a higher quality compared to similar products that contain ingredients that are not "natural," that is, ingredients that do not occur in nature. Consumers are willing to pay more for products that are "natural" than products that contain unnatural ingredients.

17. The trend towards "natural" products has manifested itself most significantly in the food industry. Grocery store shelves are now stocked with "natural" alternatives to a range of foods and beverages. Through the sale of such products, which typically command a substantial price premium, both food manufacturers and stores attempt to cash in on the substantial and increasing consumer demand for "all natural" products.

18. The importance to a reasonable consumer of a claim that a product such as Wesson Oil is "100% Natural" is demonstrated, inter alia, by Defendant's decision to label, market, and sell Wesson Oil as "100% Natural," among the various other characteristics of the product that Defendant could have advertised on the label. That is, Defendant's selection of "100% Natural" to be one of the few descriptive phrases on the front label indicates Defendant's understanding that such a descriptor is material to a typical, reasonable consumer.

19. Moreover, independent consumer research confirms the materiality to reasonable consumers of the "100% Natural" label. For example, a 2010 survey conducted by market

research firm Mintel confirms that 65% of respondents were "somewhat interested" or "very interested" in products marketed as "natural."

20. Similarly, a 2010 survey performed by the Hartman Group confirmed that substantial portions of consumers understand the word "Natural" in product labeling to indicate products that are "safer for one's health," that are freer from pathogens, and that contain "higher nutritional content." In short, consumers understand a label of "natural" on a product to provide affirmative information on that product's health and safety compared to products without such a label.

GMOs Are Not "Natural," and Products Containing GMOs Cannot Be "100% Natural"

21. Genetically modified foods are made from plants or animals, the DNA of which has been deliberately altered by the forced introduction of DNA from other species using biotechnology. Genetically modified organisms have specific traits, such as resistance to certain herbicides, which they do not possess in nature or through traditional cross-breeding methods. Plants and other life forms that are products of this process of unnatural DNA alteration are commonly referred to as genetically modified organisms, or "GMOs."

22. GMOs are not natural at all, let alone "100% Natural." In a May 2014 article on "Food Safety" entitled "Frequently asked questions on genetically modified foods," for example, the World Health Organization stated as follows:

> Genetically modified organisms (GMOs) can be defined as organisms (i.e. plants, animals or microorganisms) in which the genetic material (DNA) has been altered in a way ***that does not occur naturally by mating*** and/or natural recombination. The technology is often called "modern biotechnology" or "gene technology", sometimes also "recombinant DNA technology" or "genetic engineering". It allows selected individual genes to be transferred from one organism into another, also between nonrelated species. Foods produced from or using GM organisms are often referred to as GM foods.

6

http://www.who.int/foodsafety/areas_work/food-technology/faq-genetically-modified-food/en/ (emphasis added) (last visited April 4, 2017).

23. GMOs by definition are not "natural" because they do not occur naturally but instead are created through bioengineering technology. Numerous sources confirm this common sense understanding. *See, e.g.*, European Commission, "Genetically Modified Organisms," last updated April 4, 2017, http://ec.europa.eu/food/plant/gmo_en (distinguishing between "naturally occurring variations" in plant and animal genetic makeup with genetic material that is "modified artificially"); G. Tyler Miller and Scott Spoolman, Cengage Learning, *Environmental Science*, Fifteenth Edition, 2016. ("Engineers use a process called gene splicing to alter an organism's genetic material through adding, deleting, or changing segments of its DNA. The goal of this process is to add desirable traits or to eliminate undesirable ones by enabling scientists to transfer genes between different species that would not normally interbreed in nature. The resulting organisms are called genetically modified organisms (GMOs)."); and Chelsea Powell, Harvard University Graduate School of Arts and Sciences, "Special Edition on GMOs: How to Make a GMO," August 9, 2015, http://sitn.hms.harvard.edu/flash/2015/how-to-make-a-gmo/ ("Genetically modified organisms (GMOs) are organisms that have been altered using genetic engineering methods . . . . The key steps involved in genetic engineering are identifying a trait of interest, isolating that trait, inserting that trait into a desired organism, and then propagating that organism . . . . Genetic engineering is a term used to describe biotechnological methods used by scientists to directly manipulate an organism's genome.").

Reasonable Consumers Understand "Natural" to Indicate a Product Contains No GMOs

24. In light of the common sense and widespread understanding that GMOs are not naturally occurring ingredients, a reasonable consumer would understand the phrase "100% Natural" to indicate that the product was free of unnatural ingredients, including GMOs.

7

25. Independent surveys have confirmed that consumers understand the phrase "100% Natural" to indicate, among other things, that a product is free of GMOs. For example, a survey commissioned by the Consumer Reports National Research Center, which posed questions to a nationally representative sample in December 2015 with a margin of error of only +/- 3.1 percentage points at a 95% confidence level, concluded that "[m]any consumers think that the natural…label…*currently* means that no…genetically modified ingredients…were used." Specifically, 60% of respondents indicated that a "Natural" label on packaged foods indicates that the product has "No GMOs." That is, consumers understand the phrase "All Natural" as a shorthand promise that the product does not contain GMOs and other ingredients that do not occur naturally.

26. Reaching almost identical results to the Consumer Reports survey, the 2010 Hartman Group survey discussed above concluded that 61% of consumers understood the phrase "Natural" to indicate an "absence of genetically modified foods."

Wesson Oils Are Not "100% Natural" Because They Contain GMOs

27. Food manufacturers such as Conagra have taken full advantage of consumer sentiment in favor of all natural products in foods. Conagra for decades has used terms like "Natural" and "100% Natural" on labels of its products, and during all times relevant to this case, it affixed the "Pure & 100% Natural" representation on all bottles of Wesson Oil sold in Massachusetts.

28. Wesson Oil, however, contained unnatural ingredients. Specifically, Wesson Oil is made from GMOs, including genetically modified rapeseed (canola oil), soybeans and corn.

29. A January 29, 2016 report from Consumer Reports confirmed that Wesson Oils contain such ingredients: "The bottle displays a "Pure & 100% Natural" claim, but the oil is made from soybeans genetically engineered to withstand herbicides." (emphasis in original).

8

30. Conagra has also admitted that Wesson Oils contained GMOs. In a class action lawsuit brought against Conagra by consumers in other states, Conagra admitted in its answer in that case that "most rapeseed, soybean, and corn crops in North America were grown from seeds that have a bioengineering heritage, and that Wesson Oil products are made in whole or in part from corn, soybean and rapeseed grown in North America." *See In re ConAgra Foods, Inc.*, No. CV 11-05379-MMM (AGRx), Dkt. No. 145 ¶ 46 (C.D. Cal. Jan. 16, 2013) (the "California Class Action"). Moreover, following the filing of that lawsuit, Conagra confirmed in its 2011 Corporate Responsibility Report that its "Wesson Oil products…are produced with bio-engineered oil seeds." ("Bio-engineered" is food manufacturers' preferred term for "GMOs." The words mean the same thing.)

31. The prominent labeling on the front of Wesson Oil bottles representing the products are "100% Natural" was therefore false and misleading.

Plaintiff's Purchases of Wesson Oil

32. Plaintiff purchased bottles of Wesson Vegetable Oil from Roche Bros. and Stop & Shop stores in Massachusetts on multiple occasions. Specifically, Plaintiff purchased Wesson Vegetable Oil five or six times per year and used it for cooking and salad dressing. She previously lived on Cape Cod until approximately two years ago. When she lived on Cape Cod, she purchased Wesson Vegetable Oil from the Roche Bros. store at 11 Commercial Street in Mashpee, Massachusetts. After she moved two years ago to Brookline, Massachusetts, she purchased Wesson Vegetable Oil from the Stop & Shop store on Harvard Street in Brookline.

33. At the time of her purchases in both stores, Plaintiff read the front label of the bottles and believed that Wesson Oil was in fact 100% Natural, meaning that it contained no unnatural ingredients such as GMOs.

34. After using Wesson Oil, Plaintiff learned that, contrary to the representations in large print on the front of the bottle, the product contained unnatural ingredients—GMOs—and was therefore not "100% Natural."

35. After Plaintiff learned that Wesson Oil is not really "100% Natural" because it contained GMOs, she never again purchased Wesson Oil (after having been a regular customer for years) and now purchases another brand of oil.

<u>Plaintiff and Other Consumers Suffered Injury and Damages Due to Defendant's False Representations Concerning the Contents of Wesson Oil</u>

36. Plaintiff and other consumers have been injured, economically and otherwise, by the misrepresentations that the oil she purchased was 100% Natural, including because she paid for but did not receive a product that was actually 100% Natural, and because Plaintiff would not have purchased Wesson Oil had she known it contained GMOs and was not 100% Natural.

37. More specifically, the value to a reasonable consumer of the product Defendant promised—a truly "All Natural" oil—is materially greater than the value of the product Plaintiff actually received—a product containing unnatural GMO ingredients. That is, Plaintiff received a product that was materially less valuable than the product that Defendant promised to her, whether value is measured by retail price or by consumers' willingness to pay.

38. For example, the December 2015 Consumer Reports National Research Center survey discussed above confirmed that the "overwhelming majority (87%) of…consumers" who "buy food labeled *natural*" are willing to "pay even more" for such products if the products meet their expectations for what "natural" means, including that the products are free of GMOs. That is, GMO-free products are more valuable, measured by consumer willingness to pay, than products containing GMOs, and consumers seek out such products in part by focusing on whether products are labeled as "Natural."

39. Similarly, Nielsen's 2015 Global Health & Wellness Survey, commissioned by Nielsen N.V., a global information and measurement company, in which a representative sample of more than 30,000 consumers were polled, concluded that 88% of those polled are willing to pay more for foods they perceive to be healthier, including those that are GMO-free.

40. Likewise, the 2010 Mintel survey discussed above confirmed that 62% of consumers who purchase "natural" products agree that it is "worth paying more for natural products for some types of items," and therefore, "many [consumers] are tolerant of price premiums with natural…items." The same report also noted that consumer willingness to pay translates into a price premium that consumers pay for purportedly "natural" products.

41. The difference in value between GMO-free products and products containing GMOs is confirmed further by analyses performed specifically with respect to cooking oils. A preliminary regression analysis performed by an expert in the California Class Action against Conagra confirmed that cooking oils labeled as "All Natural" were sold at a price premium compared to oils without such a label. This price premium for so-called "All Natural" products provides further confirmation of the difference in value between "All Natural" products and products that contain unnatural ingredients such as GMOs. Notably, the Court in the California Action, in the context of a class certification motion, rejected Defendant's challenges to Plaintiff's damages analysis, finding the analysis sufficiently reliable (together with other evidence) to provide classwide evidence of the damages consumers experienced due to Conagra's deceptions.

42. Defendant's prominent use of the false label "All Natural" on Wesson Oil also caused Defendant to sell a greater volume of Wesson Oil than it otherwise would have sold without the false label, enabling Defendant to extract additional profits from duped customers

and to obtain a greater market share in cooking oils than they would have obtained absent deception.

## Class Action Allegations

43. Plaintiff realleges and incorporates the allegations contained in the paragraphs above.

44. Plaintiff brings this action pursuant to Massachusetts Rule of Civil Procedure 23 and Chapter 93A, Section 9(2) on behalf of herself and a Class consisting of:

> All persons who have purchased Wesson Oil products in Massachusetts that were labeled "100% Natural."

45. Plaintiff reserves the right to amend the definition of the Class.

46. This action is properly maintainable as a class action.

47. The members of the Class are sufficiently numerous that joinder of all members is impractical.

48. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Wesson Oil products were sold with the label "100% Natural";

(b) Whether the products so labeled in fact were 100% Natural;

(c) Whether, how, and when Defendant disclosed that Wesson Oil contained GMOs;

(d) Whether Defendant's conduct alleged herein constituted unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Chapter 93A, Section 2; and

(e) The proper measure of damages.

49. Plaintiff's claims are typical of the claims of the members of the Class because, like Plaintiff, each Class member purchased Wesson Oil products that were mislabeled as alleged herein.

50. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff does not have any interest adverse to the Class.

51. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Furthermore, the damage that has been suffered by any individual Class member is likely not substantial, and the expense and burden of individual litigation would make it impracticable for all members of the Class to redress the wrongs done to them individually. There will be no difficulty in the management of this action as a class action.

52. The prosecution of separate actions against Defendant would create a risk of inconsistent or varying adjudications with respect to the individual Class members which could establish incompatible standards of conduct for Defendant. In addition, adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of the interests of the other members of the Class not parties to such adjudications, or could substantially impede or impair their ability to protect their interests.

53. The members of the Class are readily identifiable through Defendant's records and other records, and Plaintiff is a member of the Class.

54. Defendant has acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

(Violation of Chapter 93A)

55. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

56. At all relevant times, Defendant was engaged in trade or commerce within the Commonwealth of Massachusetts, including the trade or commerce of selling, or causing to be sold, the Wesson Oil products at issue within the Commonwealth of Massachusetts.

57. By conducting the unfair and deceptive branding efforts described above, Defendant has engaged in unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Chapter 93A, Section 2.

58. In addition, and as an additional basis for liability under Chapter 93A, by engaging in the conduct described above, Defendant violated at least the following General Regulations of the Massachusetts Attorney General:

    a.    940 C.M.R. 3.02(2), which states:

No statement or illustration shall be used in any advertisement which creates a false impression of the grade, quality, make, value, currency of model, size, color, usability, or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another.

    b.    940 C.M.R. 3.05(1), which states:

No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect. This prohibition includes, but is not limited to, representations or claims relating to the construction, durability, reliability, manner or time of performance, safety, strength, condition, or life expectancy of such product, or financing relating to such product, or the utility of such product or any part thereof, or the ease with which such product may be operated, repaired, or maintained or the benefit to be derived from the use thereof.

    c.    940 C.M.R. 3.16(1)-(2), which make any act or practice a violation of Chapter 93A, Section 2 (and thus Section 9) if:

(1) It is oppressive or otherwise unconscionable in any respect; or

(2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction . . . .

      d.      940 C.M.R. 6.03(2), which states:

Sellers shall not use advertisements which are untrue, misleading, deceptive, fraudulent, falsely disparaging of competitors, or insincere offers to sell.[1]

      e.      940 C.M.R. 6.04(1)-(2), which state:

(1) Misleading Representations. It is an unfair or deceptive act for a seller to make any material representation of fact in an advertisement if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading, or if the seller does not have sufficient information upon which a reasonable belief in the truth of the material representation could be based.

(2) Disclosure of Material Representations. It is an unfair or deceptive act for a seller to fail to clearly and conspicuously disclose in any advertisement any material representation, the omission of which would have the tendency or capacity to mislead reasonable buyers or prospective buyers . . . .

59. Defendant's violations of the regulations enumerated above constitute additional violations of Chapter 93A, Section 2(a) because regulations promulgated by the Massachusetts Attorney General under Chapter 93A, Section 2(c) provide that any act or practice violates Chapter 93A, Section 2 if "[i]t fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection . . . ." 940 C.M.R. 3.16(3).

60. The violations of Chapter 93A by Defendant as described herein were done willfully, knowingly, and in bad faith.

---

[1] "An unfair or deceptive representation may result not only from direct representations and the reasonable inferences they create, but from the seller's omitting or obscuring a material fact." 940 C.M.R. 6.03(4).

61. As a direct and proximate result of Defendant's conduct, Plaintiff and the members of the Class were harmed when they paid for and received a product (oil with unnatural GMOs) that was less valuable than the product promised to them (a "100% Natural" oil).

62. Under Chapter 93A (M.G.L. c. 39A § 9), no pre-suit demand is required when either the respondent maintains no place of business or keeps no assets in the Commonwealth. Although Plaintiff sent a pre-suit demand to Conagra, no pre-suit demand was required because when this action was filed, Conagra did not maintain a place of business and did not keep any assets within Massachusetts.

63. Although not required, Plaintiff sent Defendant written demand for relief pursuant to Chapter 93A, Section 9, identifying the claimant and reasonably describing the unfair acts or practices relied upon and the injuries suffered, on February 16, 2017. Defendant did not responded to Plaintiff's demand.

64. As a result of Defendant's violation of Chapter 93A, Defendant is liable to Plaintiff and the Class for up to three times the damages that Plaintiff and the Class incurred, or at the very least the statutory minimum award of $25 per purchase of a Wesson Oil product as alleged herein, together with all related court costs, attorneys' fees, and interest.

## **Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

1. Allowing this action to proceed as a class action under Massachusetts Rule of Civil Procedure 23 and Chapter 93A, Section 9(2);

2. Awarding Plaintiff and members of the Class monetary damages;

3. Awarding Plaintiff and members of the Class up to three times their damages, or in the alternative statutory damages, together with interest and costs;

4. Awarding counsel for the Plaintiff and the Class their reasonable attorneys' fees and expenses;

5. Awarding such other and further relief which the Court finds just and proper.

### Jury Demand

Plaintiff demands a trial by jury on all claims so triable.

Dated: March 16, 2021

By her attorneys,

*/s/ Patrick J. Vallely*
Edward F. Haber (BBO # 215620)
Patrick J. Vallely (BBO # 663866)
**SHAPIRO HABER & URMY LLP**
Seaport East
Two Seaport Lane, Floor 6
Boston, MA 02210
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
pvallely@shulaw.com

*Attorneys for Margaret Lee and the proposed class*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading was filed electronically through the Court's electronic filing system and that notice of this filing will be sent to all counsel of record in this matter by operation of the Court's ECF system.

Dated: March 16, 2021

/s/ Patrick J. Vallely
Patrick J. Vallely